838 F.2d 35
 27 ERC 1227, 56 USLW 2441, Bankr. L. Rep.
P 72,182,
18 Envtl. L. Rep. 20,494
 In re COMBUSTION EQUIPMENT ASSOCIATES, INC., Debtor.
CARTER DAY INDUSTRIES, INC., f/k/a Combustion Equipment
Associates, Inc., Plaintiff-Appellant,
v.
UNITED STATES ENVIRONMENTAL PROTECTION AGENCY and New Jersey
Department of Environmental Protection,
Defendants-Appellees.
 No. 424, Docket 87-5022.
 United States Court of Appeals,
Second Circuit.
 Argued Dec. 7, 1987.
Decided Jan. 22, 1988.
 
 Roy Babitt, New York City (Anderson, Russell Kill & Olick, P.C., Arthur S. Olick, of counsel), for plaintiff-appellant.
 Richard M. Schwartz, New York City, Asst. U.S. Atty., S.D.N.Y. (Rudolph W. Giuliani, U.S. Atty., S.D.N.Y., Steven E. Obus, Mary Ellen Kris, Asst. U.S. Attys., New York City, Jacques B. Gelin, Appellate Section, Land and Natural Resources Div., U.S. Dept. of Justice, Washington, D.C., Randye B. Stein, Asst. Regional Counsel, Region II, U.S. E.P.A., New York City, Margaret Silver, Office of Gen. Counsel, U.S. E.P.A., Paul N. Schneider, Trenton, N.J., Deputy Atty. Gen., State of N.J., Dept. of Law & Public Safety, of counsel), for defendants-appellees.
 Before FEINBERG, Chief Judge, and OAKES and PRATT, Circuit Judges.
 FEINBERG, Chief Judge:
 
 
 1
 This case involves the interplay of three statutes: the Declaratory Judgment Act, the Bankruptcy Code and the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA). Specifically, Carter Day Industries, Inc., asks us to hold ripe a suit seeking a declaratory judgment that any liability it might have had under CERCLA was discharged by its bankruptcy. For the reasons stated below, we agree with the district court that this suit is not ripe, and we affirm.
 
 I. BACKGROUND
 
 2
 The record and opinion below reveal the following undisputed facts. In 1980, Carter Day, then known as Combustion Equipment Associates, filed for voluntary reorganization under Chapter 11 of the Bankruptcy Code, 11 U.S.C. Secs. 1101 et seq. Thereafter, October 29, 1982, was fixed as the bar date for the filing of creditors' claims. The plan of reorganization was confirmed in December 1983.
 
 
 3
 In October 1981 (over two years prior to confirmation of the plan), Combe Fill Corporation, a Carter Day subsidiary that operated two landfills in New Jersey, petitioned for liquidation under Chapter 7 of the Bankruptcy Code, 11 U.S.C. Secs. 701 et seq. One of the landfill sites was closed just before, and the other just after, the Chapter 7 petition was filed. Water-quality samples revealed that hazardous wastes had contaminated the groundwater at both sites, and during the bankruptcy proceeding the New Jersey Department of Environmental Protection (the New Jersey Department) filed a claim against Combe Fill for $5 million to cover closure costs and penalties. On consent, the claim was allowed for $50,000 in January 1984.
 
 
 4
 The New Jersey Department also filed an identical claim against Carter Day, in its Chapter 11 proceeding. However, on July 7, 1983, the claim was disallowed, apparently because under applicable New Jersey law Combe Fill and not Carter Day was liable.
 
 
 5
 In September and October 1983, the United States Environmental Protection Agency (EPA) notified Carter Day (along with about 190 others) that it was a potentially responsible party (PRP) for the cleanup of both sites under 42 U.S.C. Sec. 9607. Pursuant to CERCLA, the EPA then funded a Remedial Investigation and Feasibility Study (RI/FS) to develop a strategy for cleaning up the sites. The RI/FS was completed in May 1986, and a Record of Decision (ROD) setting out the EPA's planned action to clean one of the sites was made in September 1986.
 
 
 6
 The EPA filed no claims against Carter Day before the confirmation of Carter Day's Chapter 11 reorganization in December 1983. However, in January 1986 the EPA filed a claim against Combe Fill in its Chapter 7 bankruptcy proceeding for administrative expenses amounting to about $300,000. In May 1986, the Combe Fill claim was allowed in that proceeding for $50,000 subject to the Trustee's abandoning the sites to Combe Fill under section 554 of the Bankruptcy Code.
 
 
 7
 Apparently fearing that it might be held liable for any other EPA claim relating to the sites because Combe Fill had no assets, Carter Day began an adversary proceeding in June 1986 in the United States Bankruptcy Court for the Southern District of New York, seeking a declaratory judgment that any CERCLA liability Carter Day may have had for the Combe Fill sites was discharged by its Chapter 11 bankruptcy reorganization.[1] In November 1986, upon EPA's motion to the United States District Court for the Southern District of New York pursuant to 28 U.S.C. Sec. 157(d), Leonard B. Sand, J., withdrew the earlier reference of the adversary proceeding to the Bankruptcy Court. 67 B.R. 709 (S.D.N.Y.1986). Thereafter, in an opinion dated April 17, 1987, Judge Sand held the suit was not ripe and dismissed the complaint. 73 B.R. 85 (S.D.N.Y.1987). This appeal followed.
 
 II. DISCUSSION
 
 8
 The underlying issues in this case involve a conflict between two important national policies reflected in two statutes: the Bankruptcy Code and CERCLA. The conflict begins at a basic level, since the goal of CERCLA--cleaning up toxic waste sites promptly and holding liable those responsible for the pollution--is at odds with the premise of bankruptcy, which is to allow debtors a fresh start by freeing them of liability.
 
 
 9
 The two statutes also differ in their timing. To foster rapid cleanup, Congress embraced a policy of delaying litigation about cleanup costs until after the cleanup. Thus, under CERCLA, liability is not assessed until after the EPA has investigated a site, decided what remedial measures are necessary, and determined which PRPs will bear the costs. As we reasoned in Wagner Seed Co. v. Daggett, 800 F.2d 310, 315 (2d Cir.1986), "[t]o introduce the delay of court proceedings at the outset of a cleanup would conflict with the strong congressional policy that directs cleanups to occur prior to a final determination of the party's rights and liabilities under CERCLA." See also Wheaton Industries v. EPA, 781 F.2d 354, 356 (3d Cir.1986); Lone Pine Steering Committee v. EPA, 777 F.2d 882, 887-88 (3d Cir.1985), cert. denied, 476 U.S. 1115, 106 S.Ct. 1970, 90 L.Ed.2d 654 (1986). In fact, Congress amended CERCLA in 1986 to make clear that the statute precluded preenforcement judicial review. See 42 U.S.C.A. Sec. 9613(h) (West Supp.1987); H.Rep. 253(I), 99th Cong., 2d Sess. 81, reprinted in 1986 U.S.Code Cong. & Ad.News 2835, 2863. In contrast to CERCLA's preference for delaying litigation, a preference that postpones the fixing of liability on specified parties or in specified amounts, the Bankruptcy Code often accelerates litigation by allowing a bankruptcy judge to estimate contingent liabilities, 11 U.S.C. Sec. 502(c), thereby fixing them for the purpose of sharing in the assets of the estate before they would have otherwise matured.
 
 
 10
 Against this backdrop, Carter Day seeks a judgment pursuant to the Declaratory Judgment Act (the Act), 28 U.S.C. Sec. 2201, that its CERCLA liability has been discharged by its bankruptcy. The Act states that "[i]n a case of actual controversy ... any court of the United States ... may declare the rights and other legal relations of any interested party." The purpose of the Act is to enable parties to adjudicate disputes before either side suffers great damage. However, accelerated judicial intervention creates the risk of burdening the courts and the litigants with disputes that were otherwise destined to disappear by themselves, a problem particularly acute when the burdened party is an agency of a coordinate branch of the government charged by Congress with administering a statutory program. See Abbott Laboratories v. Gardner, 387 U.S. 136, 148-49, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967). To mitigate the problems of premature adjudication, the courts have held the declaratory judgment remedy discretionary, even when an "actual controversy" exists in the constitutional sense. Abbott Laboratories, 387 U.S. at 148, 87 S.Ct. at 1515; Muller v. Olin Mathieson Chemical Corp., 404 F.2d 501, 505 (2d Cir.1968). However, the standard for reviewing a district court's decision to grant or refuse declaratory relief differs from that applied to most other discretionary rulings in that the court of appeals "may substitute its judgment for that of the lower court." Maryland Casualty Co. v. Rosen, 445 F.2d 1012, 1014 (2d Cir.1971). See Friendly, Indiscretion about Discretion, 31 Emory L.J. 747, 778-79 (1982). Nonetheless, in this case our conclusion coincides with the district court's, and, relying on our discretion, we agree that the case is not ripe.
 
 
 11
 As correctly stated by the district court, the Supreme Court has indicated that we should consider two issues when determining whether a declaratory judgment action is ripe: the fitness of the matter for judicial decision and the hardship to the parties of withholding court consideration. Abbott Laboratories, 387 U.S. at 149, 87 S.Ct. at 1515. Among the factors determining whether the matter is fit for judicial decision are (1) whether the agency action is "final" and (2) whether the issue is purely legal or whether "consideration of the underlying legal issues would necessarily be facilitated if they were raised in the context of a specific attempt to enforce the regulations." Gardner v. Toilet Goods Association, 387 U.S. 167, 171, 87 S.Ct. 1526, 1528, 18 L.Ed.2d 704 (1967).
 
 A. Fitness for Judicial Review
 
 12
 1. Finality--The finality requirement of the Administrative Procedure Act, see FTC v. Standard Oil Co., 449 U.S. 232, 238-43, 101 S.Ct. 488, 492-95, 66 L.Ed.2d 416 (1980), is not implicated in this case because the suit does not ask us to review the propriety of the EPA's action. Indeed, Carter Day concedes that had a non-bankrupt plaintiff challenged the correctness of the EPA's decision to issue a PRP letter, the suit would be barred by Wagner Seed, supra. However, Carter Day's suit is different. Instead of arguing that the EPA's actions are wrong, Carter Day claims that even if the EPA is correct, Carter Day's liability has been discharged by the company's bankruptcy. Nevertheless, we believe that the tentative nature of the EPA's action is still relevant because it indicates why the substantive issues Carter Day seeks to raise might never have to be decided.
 
 
 13
 The PRP letter is not a final, definitive ruling with the status of a law demanding immediate compliance since it does not impose any liability on Carter Day. All the letters say is that "responsible parties may be liable for money expended," and that Carter Day "may have responsibility for undertaking remedial actions at the site[s]" because it "may have disposed of hazardous substances ... at the site[s]." (emphasis added). The EPA sent about 190 such letters for the two sites in question to parties who were potentially responsible; the EPA did not determine whether any of the parties were actually liable, since final determinations of liability are made only after a remedial plan has been adopted, and enforcement or cost-recovery actions are not begun without Justice Department authorization. Moreover, an EPA affidavit in the record states that the EPA has not yet decided whether to act, if at all, against Carter Day by ordering it to clean up the sites under penalty of fines and triple damages, 42 U.S.C. Secs. 9606, 9607(c)(3), or by cleaning up the sites itself and then seeking reimbursement from Carter Day pursuant to 42 U.S.C. Secs. 9604 and 9607. Indeed, the only requirement the PRP letters imposed on Carter Day was that it answer seven questions concerning its activities at the sites and its relationship with Combe Fill. Carter Day answered the questions in two pages and does not now object to having done so. Similarly, the RI/FS and the ROD do not impose any liability on Carter Day because they also do not determine that Carter Day is a responsible party.
 
 
 14
 Carter Day argues, however, that the EPA's action has the practical effect of a final action because the possibility of CERCLA liability prevents it from getting the fresh start envisioned by the Bankruptcy Code since banks and others will not deal with Carter Day for fear of the CERCLA damages. We address this argument below, and pause here only to note that we have been directed to no evidence in the record of the burden on Carter Day beyond its own general assertions without particulars. See Public Affairs Associates, Inc. v. Rickover, 369 U.S. 111, 82 S.Ct. 580, 7 L.Ed.2d 604 (1962).
 
 
 15
 2. Legal or Factual Issues--A suit raising primarily legal issues is a better candidate for declaratory judgment than is a suit raising factual issues, but commentators distinguish between factual issues arising out of events that have already occurred and factual issues arising out of future events. 10A C. Wright, A. Miller & M. Kane, Federal Practice and Procedure (2d Ed.1983) Sec. 2757. See also Salomon Bros., Inc. v. Carey, 556 F.Supp. 499, 501 (S.D.N.Y.1983). Carter Day argues that it seeks to raise the "purely legal" question of whether its CERCLA liability had risen to the level of a "claim," which was discharged by the bankruptcy. Although we agree with the EPA that the merits of the issues thus raised are not before us, we must speculate on the possible outcomes and arguments, see generally Drabkin, Moorman & Kirsch, Bankruptcy and the Cleanup of Hazardous Waste: Caveat Creditor, 15 Envl.L.Rep. 10168 (Envt'l L.Inst.1985), in order to characterize the substantive issues as factual or legal. If the law turned out to be that CERCLA liability is not a claim until the EPA seeks enforcement, then whether that liability had been discharged would be primarily a legal issue, but Carter Day would not benefit from this result because its liability would not be discharged. On the other hand, we think that if the law is otherwise, significant factual issues will need to be addressed. Admittedly, the factual questions stemming from past events will probably predominate, but, as discussed in the next section, we feel that the existence even of these issues counsels against a declaratory judgment because discerning these facts will burden the EPA and the Superfund cleanup process, thereby implicating the second prong--hardship to the parties--of our ripeness analysis.
 
 
 16
 One issue arising out of future events is what kind of remedy, if any, the EPA actually seeks from Carter Day. In Ohio v. Kovacs, 469 U.S. 274, 105 S.Ct. 705, 83 L.Ed.2d 649 (1985), the Supreme Court held that a cleanup order issued by Ohio was discharged by Kovacs's subsequent bankruptcy because the appointment of a receiver prevented Kovacs from performing personally, thereby converting the cleanup obligation into an obligation to pay money. One reading of Kovacs makes the kind of remedy EPA chooses determinative of whether a CERCLA obligation has been discharged by bankruptcy. Drabkin, supra, at 10175 (discharge "depends ... on the enforcement mechanism selected by the government"). If, for example, Ohio had sought to enforce its order through contempt proceedings instead of receivership, Kovacs would have been legally able to perform and his CERCLA liability might not have been discharged. Id. In this case, even though Carter Day assumes in its brief that the EPA will at most seek monetary reimbursement, an EPA affidavit in the record states that "the EPA has not made any decision whether to take any action under CERCLA Secs. 106 [cleanup order] or 107 [reimbursement]." Under Kovacs, it is conceivable that the ultimate legal arguments may depend on the kind of enforcement action the EPA takes, and this possibility supports deferring litigation.
 
 B. Hardship to the Parties
 
 17
 As explained above, the second factor we consider in determining whether a declaratory-judgment suit is ripe is the hardship to the parties. Carter Day argues that it would suffer if not allowed to sue now because it would be deprived of the fresh start promised by the Bankruptcy Code. Without attempting to belittle Carter Day's fears, we note that the EPA has not yet tried to coerce Carter Day or the 190 other PRPs into doing anything, and that the record contains no proof of damage already inflicted on Carter Day. We acknowledge that Carter Day's "primary conduct"--operating its pollution control and other businesses--may be affected by the possibility of liability and that this effect suports the appropriateness of adjudication now. Toilet Goods Association v. Gardner, 387 U.S. 158, 164-65, 87 S.Ct. 1520, 1524-25, 18 L.Ed.2d 697 (1967). Nonetheless, the presence of some possible harm from delaying litigation does not automatically render a dispute ripe, id., 387 U.S. at 165, n. 2, 87 S.Ct. at 1525, n. 2, if the possible harm is outweighed by other factors.
 
 
 18
 Moreover, Carter Day's concern over its fresh start seems somewhat disingenuous since it did not include its potential CERCLA liability in the required bankruptcy schedule of liabilities and since it evidently did not attempt to litigate that liability in the bankruptcy court before confirmation of the plan of reorganization, even though the PRP letters were received prior to confirmation. Cf. In re Wall Tube & Metal Products Co., 831 F.2d 118 (6th Cir.1986); In re Johns-Manville Corp., 63 B.R. 600 (S.D.N.Y.1986). If Carter Day had raised the issue before confirmation, it is at least arguable that the claim might have been estimated and thereafter discharged. Of course, the EPA might have foreclosed discharge by showing that a claim had not yet arisen or that the entire matter was not yet ripe. We take no position on these issues.
 
 
 19
 Our criticism of Carter Day for not attempting to raise the question during the bankruptcy proceeding might lead one to ask the following question: if Carter Day could have raised the issue in the bankruptcy proceeding, why may it not raise it now, that is, how could the issue be ripe then but not now? One answer is that the bankruptcy court's power to estimate contingent liabilities, 11 U.S.C. Sec. 502(c), substitutes for ripeness. The fact that some claims could be estimated does not mean that those claims would be ripe for resolution after confirmation, but only that the Bankruptcy Code authorizes the bankruptcy court to decide, in one particular procedural context, what would otherwise be unripe disputes. Under this view, the power to ripen expires with the bankruptcy court's power to estimate, and Carter Day, having not availed itself of that power, would have lost the opportunity and would now have to wait until the claim is actually ripe. We reiterate that we do not necessarily adopt this view, but merely observe that Carter Day's failure to attempt to bring its CERCLA liability within the bankruptcy proceeding, even if it would not ultimately have prevailed, is an important factor in evaluating the equitable weight to be given now to Carter Day's alleged (but nonspecific) hardship. See Abbott Laboratories, 387 U.S. at 155, 87 S.Ct. at 1519.
 
 
 20
 Also balanced against Carter Day's alleged hardship is the hardship to the EPA and to the Superfund system if PRPs can challenge the EPA at so preliminary a stage of investigation into a particular site. According to the EPA, about 10,000 PRP letters are outstanding nationwide. If the EPA is forced to expend its resources on preserving its rights to eventual recovery against any PRP that has recently emerged from bankruptcy, the EPA will have less ability to pursue its primary mission of cleaning the sites. Of course, any time an agency is forced to litigate it expends funds it might otherwise have used to further its primary purpose, but, as already discussed, Congress has directed the courts to be especially wary of interfering with CERCLA work, see Wagner Seed, supra, in part because toxic waste sites threaten the public health and must be eradicated quickly. In addition, depending on what the law turns out to be on when a CERCLA claim accrues (a matter on which we express no opinion), deciding various factual issues will interfere with Congress's policy of expediting cleanup. For example, if the law were that CERCLA liability becomes a claim in stages as the EPA incurs costs, there would be the obvious factual issues of which costs occurred at specific times. It is also possible that the courts will find that CERCLA liability does not mature into a claim in stages but accrues as a whole at some point between deposit of toxic waste and final cleanup. If so, the same sort of factual investigation may again be necessary to determine whether and when such a point was reached. Either theory would require investigation of internal EPA actions and progress in evaluating the site, with consequent possible interference with the EPA's cleanup efforts.
 
 
 21
 Moreover, other factual issues come to mind. The EPA's claim was apparently not scheduled on Carter Day's list of liabilities and the EPA therefore did not receive required formal notices in the bankruptcy proceeding, although it may have known about it. An issue in any attempt by Carter Day to discharge its CERCLA liability is whether the EPA had enough notice of what was happening in the bankruptcy proceeding to make barring its claim fair. See 5 Collier on Bankruptcy p 1141.01 (L. King, ed. 1987). We express no view, of course, as to the outcome of this hypothetical question, but note that under at least one view of the law, see In re Intaco Puerto Rico, Inc., 494 F.2d 94, 99 n. 11 (1st Cir.1974), the case might turn on what particular EPA officials actually knew. Such an inquiry into EPA's internal operations would similarly distract it from its statutory duties and conflict with the CERCLA policy of putting cleanup before litigation.
 
 III. CONCLUSION
 
 22
 In summary, Carter Day's failure to raise the issue during the bankruptcy proceeding and the potential harm to CERCLA cleanup efforts that immediate litigation in this case would engender lead us to conclude that discretionary jurisdiction under the Declaratory Judgment Act should not be exercised here. In the final analysis, there are too many red flags counseling hesitation to render a far-reaching declaratory judgment, which is the only kind that could be rendered on this record. The underlying issues are "of serious public concern" and better left to a time when the overall context of the dispute is more fully developed. Public Affairs Press v. Rickover, 369 U.S. at 112, 82 S.Ct. at 581.
 
 
 23
 It is important to stress that our holding is narrow because of the unique statutory interaction and the facts in this case. Since we have not attempted to rank the various factors that we have considered or to suggest that any particular one tips the scale, we express no opinion about the outcome of other cases seeking declaratory judgments relating to discharge of non-CERCLA liability or even of CERCLA liability based on distinguishable facts. For the present case, it suffices to say that for all the reasons stated above, we hold this action not ripe and affirm the judgment of the district court.
 
 
 
 [1]
 Carter Day sued the EPA and the New Jersey Department, and although both are appellees, the New Jersey Department joined in the EPA's brief without filing one of its own. For convenience, we therefore refer to appellees collectively as the EPA